# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN
_____

**HORICON FOODS, INC.,**
        **Plaintiff,**

      **v.**                                    **Case No. 15-C-0689**

**GEHL FOODS, LLC,**
**DAVID SCHUMACKER, and**
**DAIRY=BOND, LLC,**
          **Defendants.**
_____

## DECISION AND ORDER

This is an action for breach of contract and tortious interference with a contractual relationship. The plaintiff, Horicon Foods, Inc., alleges that one of the defendants, Gehl Foods, LLC, breached a contract in which it agreed to buy ingredients for cheese sauces from Horicon. Horicon also alleges that David Schumacker, a consultant hired by Gehl, and his company, Dairy=Bond, LLC, tortiously interfered with Horicon's contract with Gehl by advising Gehl on matters related to the contract. Before me now are motions for summary judgment filed by the defendants.[1] In this order, I also address several motions to seal portions of the summary-judgment record that have been filed by Horicon, Schumacker, and Dairy=Bond.

## I. BACKGROUND

Gehl Foods manufactures processed, mostly dairy-based food products, such as cheese sauces. Until recently, Horicon Foods supplied Gehl with three ingredients for

_____

[1] Before moving for summary judgment, Schumacker and Dairy=Bond filed a motion to dismiss Horicon's claims against them. However, that motion has been superseded by Schumacker and Dairy=Bond's motion for summary judgment. I will deny the motion to dismiss as moot.

Case 2:15-cv-00689-LA   Filed 09/15/16   Page 1 of 26   Document 96

its cheese sauces: an enzyme modified cheese known as "Special 23," and two cheese flavorings. This suit arises out of Gehl's decision to stop purchasing these ingredients from Horicon. Horicon contends that the parties' contract requires Gehl to purchase all of its requirements of these ingredients from Horicon, and that Gehl has breached the contract by receiving these ingredients from another source. Horicon also alleges that Gehl's consultant, David Schumacker, and his firm Dairy=Bond, interfered with the contract between Horicon and Gehl by advising Gehl to receive the ingredients from another source. The following facts are based on the materials in the record that I may consider in connection with a motion for summary judgment under Federal Rule of Civil Procedure 56(c), construed in the light most favorable to Horicon.

The relationship between Gehl Foods and Horicon began in the 1980s, when John Gehl, Gehl Foods' former president, met Robert Studer. Over the years, Studer helped develop products for Gehl Foods. In approximately 2010, John Gehl informed Studer that Gehl Foods was having issues with its then-current supplier of enzyme modified cheese. In response, Studer proposed that Gehl Foods make its own enzyme modified cheese "in house." John Gehl told Studer that Gehl Foods was not equipped to do this, and he suggested that Studer form his own company to develop and produce enzyme modified cheese for Gehl Foods. Studer, who was then 76 years old, agreed to come out of retirement for this purpose. Studer then incorporated Horicon Foods and began developing an enzyme modified cheese for Gehl.

By August of 2010, Horicon had developed an enzyme modified cheese that met Gehl Foods' requirements. Gehl Foods decided to begin purchasing this product from Horicon. However, Gehl Foods did not immediately agree to purchase all of its enzyme modified cheese from Horicon. Instead, Gehl Foods thought that it would be best if it

2

had two suppliers. John Gehl thus informed Studer that Horicon should produce two loads of enzyme modified cheese per month, which was one-half of Gehl's monthly demand for that product. Gehl would then purchase another two loads per month from a different supplier. On November 4, 2010, Gehl Foods and Horicon entered into a contract in which Gehl agreed to "place every other order for purchase of" enzyme modified cheese with Horicon.

By the end of 2011, Gehl Foods had decided that it would begin purchasing all of its enzyme modified cheese from Horicon. It also decided to begin purchasing certain cheese flavors from Horicon. On April 16, 2012, the parties entered into the contract that is at issue in this suit. The contract provides that Gehl would purchase "enzyme modified cheese" and "flavors" from Horicon. *See* First Amended & Restated Purchase Agreement [hereinafter "Contract"] at 1, ECF No. 13-3. It states that Gehl would purchase from Horicon "quantities of products manufactured and packaged by Horicon in accordance with the specifications set forth in Schedule A." Schedule A, in turn, is divided into three parts: A-1, A-2, and A-3. Schedule A-1 is entitled "Specifications for EMC," and it describes the product as "Special 23-H Cheese in 40lb blocks." Schedule A-2 is entitled "Specification for Cheese Flavor #93-2003," and Schedule A-3 is entitled "Specification for Cheese Flavor #93-2101."

The contract contains a section entitled "EMC Exclusivity and Production Commitment." *Id.* § 3. Because this provision of the contract is central to the parties' arguments, I quote it in full:

3. *EMC Exclusivity and Production Commitment*

a. Effective four months after the Effective Date: Gehl agrees to purchase, and Horicon agrees to manufacture and sell, 100% of Gehl's requirements of the enzyme modified

3

cheese identified in Schedule A ("EMC"), in quantities specified in Gehl's purchase orders.

b.    Gehl is not obligated to purchase any minimum amount of EMC beyond its actual business requirements.

c.    Limitations on exclusivity: Gehl could receive EMC from another source if, for any reason, any of the following occur:

i.    Horicon rejects or otherwise fails to accept an order placed by Gehl;

ii.    Horicon is unable to deliver 100% of Gehl's requirements in any 30 consecutive day period;

iii.    Horicon delivers non-compliant product and cannot cure the problem within the timeframe needed by Gehl, or if the problem is recurring; or

iv.    Horicon is in breach of the Agreement.

*Id.*  Another provision of the contract that is important to this case is one entitled "Development."  *Id.* § 19.  It states:

19.    *Development.*  Horicon acknowledges that the products being developed, used or sold by Horicon, or that may in the future be developed, used or sold by Horicon, may be similar or identical to existing products or products under development at Gehl at any time, and that nothing in this Agreement is intended to or shall prevent Gehl from continuing to develop, produce, use or sell any products.

*Id.*

The contract does not require Gehl to purchase any minimum amount of product from Horicon.  *See* Contract § 3.b.  When the parties began to perform under the amended contract, Gehl routinely ordered four loads of enzyme modified cheese from Horicon each month.  However, a few months later, Gehl reduced its monthly orders. Between September and December 2012, Gehl ordered only three loads per month.  In March 2013, Studer asked John Gehl if the decline in orders was caused by a decline in sales of its cheese sauces.  Gehl told Studer that he was not aware of any drop in

4

sales.  In April or May 2013, Gehl Foods informed Horicon that from now on its monthly order of enzyme modified cheese would be 3.2 loads per month rather than four loads. When Studer asked Gehl Foods' chief financial officer why Gehl would need only 3.2 loads per month, he responded by stating that those were Gehl's needs.

On October 4, 2013, John Gehl and Studer met for lunch.  At that lunch, Gehl told Studer that Gehl Foods had retained Schumacker and Dairy=Bond as consultants, and that with their help, Gehl Foods had been able to develop a product to replace the enzyme modified cheese that it had been purchasing from Horicon.  John Gehl also informed Studer that Gehl Foods had retained another company, Avoca Bioprocessing Corporation, to manufacture the substitute product for Gehl.  Gehl informed Studer that Gehl Foods had been purchasing the substitute product from Avoca for about one year, and that this was why Gehl Foods had reduced its orders of Horicon's products in September 2012.  Gehl also stated that Gehl Foods was in the process of switching over the biggest portion of Gehl's cheese-sauce production from Horicon's product to the substitute product.  Gehl told Studer that Gehl Foods' use of the substitute product had resulted in considerable cost savings.

After the lunch meeting between Gehl and Studer, Gehl Foods further reduced its purchases of enzyme modified cheese from Horicon.  Between November 2013 and October 2014, Gehl ordered a total of 16 loads of enzyme modified cheese from Horicon.  Between November 2014 and May 2015, Gehl ordered only four loads from Horicon.  In May 2015, Gehl told Horicon to stop production of the enzyme modified cheese altogether.

During the time period that Gehl Foods was reducing its orders of enzyme modified cheese from Horicon, Gehl was also reducing its orders of the two cheese

flavors from Horicon. First, Gehl ceased purchasing the flavor described in Schedule A-3 to the contract because Gehl no longer made the product that used the flavor as an ingredient. Second, Gehl reduced and eventually eliminated its orders of the cheese flavor in Schedule A-2 to the contract because Gehl, with help from Schumacker and Dairy=Bond, developed a substitute for that flavor and contracted with Avoca to manufacture it.

With no orders from Gehl Foods for enzyme modified cheese or cheese flavors, Horicon has no active customers and no income.

According to Horicon's evidence, Gehl Foods began its efforts to develop its own enzyme modified cheese and cheese flavors in 2009. On February 1, 2009, Gehl entered into a contract with Schumacker and Dairy=Bond for consulting services. The contract states that the scope and nature of the consulting services to be provided would be determined "from time to time" by the president and chief executive officer of Gehl, but that the scope of the services would at least include "the development of specialty dairy ingredient technology." Consulting & Licensing Agreement § 1.2.[2] Internal notes from Gehl and Dairy=Bond suggest that they began work on developing a replacement for Special 23 in March 2009. *See* Decl. of Timothy Lecher Ex. 3, ECF No. 59-3. At this time, Gehl was purchasing Special 23 from sources other than Horicon. By late 2011 or early 2012, Gehl and Dairy=Bond had produced test batches of a substitute product. *Id.* Ex. 5. Research notes from March 2012 reflect that, in addition to working on a substitute for Special 23, Gehl and Dairy=Bond were also working on substitutes for the two cheese flavors that Gehl was then purchasing from Horicon. *Id.* Ex. 7. In June 2012, Gehl and Dairy=Bond estimated that if Gehl used the substitute for

---

[2] This agreement is in the record beginning at page 30 of ECF No. 86-1.

Special 23 that was under development, it could save $330,522 per year. *Id.* Ex. 5. Gehl and Dairy=Bond also concluded that if Gehl decided to transition to the substitute product, Gehl would reduce its orders of Special 23 from Horicon by half.

In May 2012, Gehl Foods entered into a supply agreement with Avoca under which Avoca agreed to manufacture the replacements for Special 23 and the cheese flavors that Gehl and Dairy=Bond had developed. Lecher Decl. Ex. 6. The agreement was signed in May 2012 but provides that it was effective as of October 2011. The agreement states that Avoca is manufacturing the products exclusively for Gehl and that Gehl owns the intellectual-property rights to the products. *Id.* Ex. 6 §§ 2.2–2.3.

In July 2013, an email from Schumacker to Gehl's CFO stated that, at that time, Gehl's "first strategy" was to continue purchasing Special 23 from Horicon. However, Schumacker noted that if in the future Gehl decided to "move away from Horicon," it could save another $350,000 per year. *Id.* Ex. 8.

An internal Gehl email dated September 3, 2013 reflects that, around that time, Gehl had decided to transition away from Horicon's products to "Gehl I.P. flavor systems." Lecher Decl. Ex. 9. The email states that John Gehl supported the change but that he did not want anyone to contact Horicon or Studer about "the reduction of their products" until John Gehl had discussed the matter with Studer. *Id.* The email stated that John Gehl was planning to schedule a meeting with Studer in a couple of weeks.

On October 2, 2013, Schumacker wrote an email to various Gehl employees. The email outlined a proposal for phasing out the use of Horicon's Special 23 and stated that the proposal was "jointly developed" by Schumacker and two Gehl employees. ECF No. 86-6 at p. 29 of 35. The email concluded by describing the

7

proposal's "end result" as being the reduction of Gehl's purchases of Special 23 from Horicon to zero.  ECF No. 86-6 at p. 30 of 35.  The email stated that this would result in a total savings to Gehl of approximately $2 million.

As I have already noted, John Gehl met with Studer on October 4, 2013 and told him about Gehl's plans to phase out the use of Horicon's products.

## II.  DISCUSSION

Horicon alleges that Gehl's use of the substitutes for Horicon's Special 23 and its cheese flavors resulted in a breach of the exclusivity provision of the amended and restated purchase agreement.  It also alleges that Gehl's conduct amounted to a breach of the covenant of good faith and fair dealing that, under Wisconsin law, is implied in every contract.  Finally, Horicon alleges that Schumacker and Dairy=Bond tortiously interfered with the contract between Gehl and Horicon by helping Gehl develop the substitute products and transition away from Horicon's products.  Gehl moves for summary judgment on the breach-of-contract and implied-covenant claims, while Schumacker and Dairy=Bond move for summary judgment on the tortious interference claim.

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I take evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

**A.  Breach of Contract**

Horicon contends that the contract between it and Gehl provides that Horicon would be Gehl's exclusive supplier of Special 23 and the two cheese flavors, and that therefore Gehl has breached the contract by developing substitutes and purchasing them from Avoca.  In moving for summary judgment, Gehl concedes, for purposes of the motion, that the Special-23 substitute it developed is an enzyme modified cheese within the meaning of the contract's exclusivity provision.  That is, Gehl concedes that its substitute product is "the enzyme modified cheese identified in Schedule A," Contract § 3.a., and that therefore the contract would prohibit Gehl from purchasing the product from one of Horicon's competitors.[3]  But Gehl contends that the contract permits Gehl to develop and use its own "in house" version of Special 23 rather than continue to buy Special 23 from Horicon.  Gehl contends that because it, with the help of Dairy=Bond, developed the formula for the substitute product, the contract permits Gehl to purchase that product from Avoca, which manufactured the product according to the formula and specifications provided by Gehl and Dairy=Bond.

As for the cheese flavors, Gehl contends that they are not covered by the contract's exclusivity provision.  Rather, argues Gehl, the exclusivity provision applies only to "enzyme modified cheese," which the contract distinguishes from "flavors."  Gehl contends that therefore it may purchase cheese flavors from any supplier.  In its brief in opposition to Gehl's motion for summary judgment, Horicon does not argue that the two cheese flavors are covered by the contract's exclusivity provision.  To be sure, Robert

---

[3] Although for purposes of this motion Gehl concedes that its substitute for Special 23 is an enzyme modified cheese within the meaning of the contract's exclusivity provision, it represents that, in fact, the substitute product is "entirely different" from Horicon's Special 23. Br. in Supp. at 13, ECF No. 28.

Studer, in his declaration, states that the two cheese flavors are types of enzyme modified cheese, Decl. of Robert Studer ¶ 25, ECF No. 58, but even if that fact were true, it would not follow that those flavors were within the contract's exclusivity provision, as that provision applies only to "the enzyme modified cheese in Schedule A." Contract § 3.a. Horicon does not argue that the cheese flavors are "the enzyme modified cheese in Schedule A." Thus, I consider Horicon to have conceded that Gehl did not breach the contract by purchasing cheese flavors from other sources and will enter summary judgment for Gehl on Horicon's claims relating to flavors. I also note that the contract consistently distinguishes between "enzyme modified cheese" or "EMC," on the one hand, and "flavors" on the other. For example, the contract's first "whereas" clause states that "Gehl uses enzyme modified cheese ('EMC') and flavors as an ingredient in food products." And the schedules attached to the contract contain specifications and pricing for "EMC" on the one hand, and "Cheese Flavor" on the other. The contract's exclusivity provision applies only to enzyme modified cheese and says nothing about flavors. Thus, even if Horicon did not concede that the contract allowed Gehl to purchase cheese flavors from other sources, I would find that Gehl is entitled to summary judgment on Horicon's claims involving cheese flavors.

I now turn to Horicon's claim that Gehl breached the contract by purchasing a substitute for Special 23 from Avoca. Horicon does not contend that the contract unambiguously prohibited Gehl from developing its own version of Special 23 and having it manufactured by a third party such as Avoca. Rather, Horicon contends that the contract is ambiguous on this issue and that a trial is necessary. *See, e.g.*, Br. in Opp. at 13, ECF No. 56. However, as explained below, Horicon has failed to show that

10

the contract is ambiguous. Therefore, I will accept Gehl's interpretation of the contract and enter summary judgment in its favor on Horicon's claims for breach of contract.

Under Wisconsin law, which the parties agree applies to this case, a court faced with a question of contract interpretation must identify the parties' intent, as expressed in the language of their contract. *E.g., Town Bank v. City Real Estate Dev., LLC*, 330 Wis. 2d 340, 356 (2010). If the contract's language is unambiguous, the court may not consider extrinsic evidence. *Id.* Only when the contract is ambiguous, meaning it is susceptible to more than one reasonable interpretation, may the court look beyond the face of the contract and consider extrinsic evidence. *Id.* Whether the contract is ambiguous is a question of law for the court. *MS Real Estate Holdings, LLC v. Donald P. Fox Family Trust*, 362 Wis. 2d 258, 273 (2015).

Gehl offers the following interpretation of the contract: The contract's exclusivity provision, § 3, requires Gehl to purchase Special 23 only from Horicon. However, a separate provision of the contract, § 19, states that "nothing in [the contract] is intended to or shall prevent Gehl from continuing to develop, produce, use or sell" its own products. Under this provision, Gehl argues, it has the right to develop its own version of Special 23 and use that instead of continuing to purchase Special 23 from Horicon. Thus, although the contract prohibits Gehl from purchasing a form of Special 23 from one of Horicon's competitors, it does not prohibit Gehl from using its own Special 23 in lieu of Horicon's Special 23.

I conclude that Gehl's interpretation of the contract is reasonable. The development clause states that Gehl has the right to develop, produce, and use its own products, even if the products are similar to or identical to Horicon's products. The development clause further states that "nothing" in the contract is intended to or shall

11

prevent Gehl from using its own products. Although the development clause does not specifically cross-reference the exclusivity provision, and vice versa, when the two provisions are read together, it is reasonable to understand the contract as meaning that Gehl must purchase Special 23 exclusively from Horicon unless Gehl develops its own product to use in place of Horicon's Special 23. If Gehl develops its own product, it may use that product without breaching the contract.

Because Gehl's interpretation is reasonable, to show that the contract is ambiguous, Horicon must offer its own reasonable interpretation of the contract. *Town Bank*, 330 Wis. 2d at 356 (a contract is ambiguous only if it is susceptible to more than one reasonable interpretation); *see also Central States v. Waste Mgmt. of Mich., Inc.*, 674 F.3d 630, 636–37 (7th Cir. 2012) (affirming summary judgment where non-movant "has not offered any other reasonable interpretation of the unambiguous language" in ERISA plan documents); *In re Estate of Dye*, 92 Cal.App.4th 966, 976 (Ct. App. 2001) ("Every substantial claim of ambiguity must tender a candidate reading of the language which is of aid to the claimant."). In particular, because Gehl's interpretation hinges on the meaning of the contract's development provision, Horicon must offer its own reasonable interpretation of that provision.

Horicon argues that the development provision means only that Gehl is "free to engage in research and development efforts during the term of the Agreement." Br. in Opp. at 20, ECF No. 56. It is true that the provision protects Gehl's right to "develop" products, but the provision goes beyond that; it also protects Gehl's right to "produce, use or sell any products." Contract § 19. As I have noted, one reasonable interpretation of this language is that if Gehl develops alternatives to Horicon's products through its research and development efforts, Gehl may begin using those alternatives

12

in lieu of Horicon's products without breaching the contract. Horicon does not offer any alternative interpretation of this "produce, use or sell" language. Indeed, Horicon treats this language as though it has no meaning at all and is entirely superfluous. However, courts disfavor interpretations that render contractual provisions superfluous. *Ash Park, LLC v. Alexander & Bishop, Ltd.*, 363 Wis. 2d 699, 713 (2015).[4]

Horicon notes that where there is a conflict between a general and a specific provision of a contract, the specific provision controls. Br. in Opp. at 20 (citing *Isermann v. MBL Life Assurance Corp.*, 231 Wis. 2d 136, 153 (Ct. App. 1999)). Horicon then points out that the exclusivity provision specifies four circumstances under which Gehl could receive Special 23 from a source other than Horicon, and that Gehl's developing its own EMC is not one of them. Horicon contends that the exclusivity provision is the "specific" provision and that the development clause is the "general" provision, and that therefore I should give effect to the exclusivity provision and disregard the development clause to the extent it permits Gehl to produce, use and sell its own version of Special 23. However, I do not see any conflict between the exclusivity provision and the development clause that would trigger the rule requiring the general provision to give way to the specific. The development clause states that "nothing" in the contract is intended to or shall prevent Gehl from developing and using any of its own products. Contract § 19. Thus, the development clause makes clear that it overrides any other

---

[4] One possibility that occurs to me is that the development clause is simply boilerplate language that some attorney inserted into the contract without knowing the purpose it was intended to serve, and that the parties, in negotiating the contract, did not pay careful attention to that clause or intend for it to have any particular meaning. However, the language of the development clause lends itself to the interpretation that Gehl has offered, and it is the language of the agreement that controls rather than the parties' subjective intent or expectations. *See, e.g., Solowicz v. Forward Geneva Nat'l, LLC*, 323 Wis. 2d 556, 582 (2010).

provisions of the contract that might be interpreted as precluding Gehl from developing and using its own products, including its own version of Special 23. Resort to the rule giving preference to the specific clause over the general clause when there is a conflict between the two is therefore unnecessary.

Horicon next contends that even if Gehl's interpretation of the contract is correct, and Gehl is permitted to develop and use its own version of Special 23, there is a question of fact as to whether Gehl actually developed the Special 23 that it now purchases from Avoca. According to Horicon, a reasonable jury could conclude that Dairy=Bond rather than Gehl developed the formula for the substitute Special 23 and instructed Avoca on how to manufacture it. However, the materials in the record, even when construed in the light most favorable to Horicon, would not allow a reasonable jury to conclude that Dairy=Bond developed the substitute Special 23 without any input from Gehl at all. Rather, the facts make clear that Gehl hired Dairy=Bond to provide Gehl with consulting services, and that thereafter Dairy=Bond worked with Gehl's employees to develop the substitute for Special 23. In any event, Gehl would not have breached the contract even if Dairy=Bond performed the majority or all of the development work. Gehl hired Dairy=Bond to perform research and development on Gehl's behalf, *i.e.*, to formulate a substitute for Special 23 that would become the intellectual property of Gehl rather than of Dairy=Bond.[5] That formula is thus a product of Gehl's research and development efforts, even if it was not the work of Gehl's in-house employees. It therefore falls within the scope of the contract's development clause. Similarly, Gehl's

---

[5] The contract between Gehl and Dairy=Bond states that Dairy=Bond would grant an exclusive license to Gehl for any technology developed during the term of the consulting agreement, and that at the end of the agreement's term, Dairy=Bond would assign all rights to the technology to Gehl. Consulting & Licensing Agreement § 2.

Case 2:15-cv-00689-LA   Filed 09/15/16   Page 14 of 26   Document 96

hiring Avoca to manufacture the substitute for Special 23 that Gehl developed with help from Dairy=Bond does not remove it from the scope of the development clause. Gehl did not go to Avoca and purchase a version of Special 23 "off the shelf." Instead, Gehl asked Avoca to manufacture a custom product that Gehl had developed. So again, the development clause allowed Gehl to use its own substitute for Special 23.

In sum, Gehl has offered a reasonable interpretation of the contract under which it was permitted to develop its own substitute for Horicon's Special 23. Horicon has not offered a competing reasonable interpretation of the contract that does not render parts of the contract's development clause superfluous. Therefore, I must conclude that the contract is not ambiguous and means that Gehl could, without breaching the contract, develop and use its own substitute for Horicon's Special 23. Further, Gehl's using Dairy=Bond as a consultant and outsourcing its manufacturing to Avoca does not remove Gehl's substitute for Special 23 from the scope of the contract's development clause. Accordingly, Gehl is entitled to summary judgment on Horicon's claims for breach of contract.

**B. Implied Covenant of Good Faith and Fair Dealing**

I next address Gehl's motion for summary judgment as it pertains to Horicon's allegation that Gehl's actions in developing and using its own substitute for Horicon's products was a breach of the implied covenant of good faith and fair dealing. Under Wisconsin law, this implied covenant is deemed a part of every contract. *E.g., Beidel v. Sideline Software, Inc.*, 348 Wis.2d 360, 842 N.W.2d 240, 250 (2013). Although the meaning of this covenant is not precise, it is generally interpreted to prohibit a contracting party from engaging in various forms of arbitrary, unreasonable, or

opportunistic conduct. *See, e.g.*, *Market Street Assocs. v. Frey*, 941 F.2d 588, 593–97 (7th Cir. 1991); *Foseid v. State Bank*, 197 Wis. 2d 772, 796 (Ct. App. 1995).

One well-recognized form of conduct that violates the covenant of good faith is "following the letter but not the spirit of an agreement." *Beidel*, 842 N.W.2d at 250. A case decided by the Wisconsin Supreme Court, *Chayka v. Santini*, 47 Wis. 2d 102 (1970), is regarded as a classic example of this form of conduct. *See Beidel*, 842 N.W.2d at 250. In *Chayka*, a husband and wife entered into a joint will that the court treated as a contract. 47 Wis. 2d at 105. The will provided that upon one party's death, all property would go to the other and that, upon the survivor's death, the survivor's property would go to another relative. The husband died first, and all property then went to the wife. However, after the wife remarried, she transferred virtually all of her property to her new husband. When the wife died, there was virtually no property left in her estate to transfer to the relative named in the will. The wife's actions complied with the letter of the will, in that all property left in her estate was transferred to the relative. But by divesting herself of virtually all of her property before death, the wife violated the spirit of the agreement, which was to leave the couple's joint property to the relative named in the will. The supreme court held that these actions violated the implied covenant of good faith and fair dealing. *Id.* at 107.

In the present case, Horicon argues that the facts in the record permit a reasonable jury to conclude that Gehl breached the implied covenant of good faith by violating the spirit, if not the letter, of the contract. However, as I have already held, the contract reserved to Gehl the right to develop its own substitute for Horicon's products and use them instead of Horicon's products. Given this, it was necessarily within the spirit of the agreement for Gehl to use its own products instead of Horicon's. *See*

16

*Beidel*, 842 N.W.2d at 251 ("A party may not . . . employ the good faith and fair dealing covenant to undo express terms of an agreement."). This is not a case, like *Chayka*, in which a contracting party exploited a loophole in the contract to take advantage of the other party. Thus, Gehl's actions did not violate the spirit of the parties' agreement.

Horicon also contends that Gehl breached the covenant of good faith by not telling Horicon about its use of the substitute products when, between March and April 2013, Horicon made inquiries as to why Gehl had reduced its monthly orders of Special 23 from Horicon. However, the duty of good faith "is not a duty of candor." *Market Street Assocs.*, 941 F.2d at 594. And Gehl's remaining silent about its development of the substitute products was not part of some broader scheme to take advantage of Horicon. At the time Horicon made its inquiries, Gehl had not yet made the decision to transition to using its own products rather than Horicon's. Soon after Gehl made that decision, which occurred in September 2013, John Gehl met with Studer to personally deliver the news. Gehl's actions in this regard cannot be described as arbitrary or opportunistic. In any event, even if Gehl's keeping is research-and-development efforts secret could reasonably be construed as a breach of the implied covenant of good faith, Horicon has not shown that Gehl's failure to disclose its use of the substitute products in response to Horicon's inquiries caused it any harm. Horicon does not contend that it would have done anything differently had Gehl disclosed its use of the substitute products in the spring rather than the fall of 2013. Horicon does state that Gehl's silence prevented it from discovering Gehl's alleged breach of the exclusivity provision sooner, *see* Br. in Opp. at 22, but this could not have caused it any damage. Horicon learned of the alleged breach in October 2013, and if Gehl's actions amounted to a breach, Horicon would have then been able to bring a suit for damages for the entire

17

period of time in which Gehl had used its own version of Special 23 rather than Horicon's version.

Accordingly, Gehl is entitled to summary judgment on Horicon's claim for breach of the implied covenant of good faith and fair dealing.

## C. Tortious Interference

The remaining question is whether Schumacker and Dairy=Bond are entitled to summary judgment on Horicon's claim for tortious interference. Schumacker and Dairy=Bond argue that they are entitled to summary judgment on this claim for a number of different reasons. However, I will address only one of those reasons—the so-called "honest advice privilege"—because it is clear that this privilege applies and is dispositive.

Under the Restatement (Second) of Torts, one does not tortiously interfere with a contract between two other parties by giving "honest advice" to one of the parties, within the scope of a request for advice, that in turn causes the party to breach the contract. Restatement (Second) of Torts § 772(b) (Am. Law. Inst. 1979); *Joseph P. Caulfield & Assocs., Inc. v. Litho Prods., Inc.*, 155 F.3d 883, 890 (7th Cir. 1998); *Liebe v. City Fin. Co.*, 98 Wis.2d 10, 14 (Ct. App. 1980). This rule is sometimes referred to as the "honest advice privilege" or "consultant's privilege." *See J.D. Edwards & Co. v. Podany*, 168 F.3d 1020, 1022 (7th Cir. 1999). The only requirements for the existence of the privilege are (1) that advice be requested, (2) that the advice given be within the scope of the request, and (3) that the advice be honest. Restatement § 772, cmt. c. Although the Wisconsin Supreme Court has not explicitly adopted § 772 of the Restatement, the Wisconsin Court of Appeals has. *See Liebe*, 98 Wis. 2d at 14; *Hale v. Stoughton Hosp. Ass'n, Inc.*, 126 Wis.2d 267, 281–82 (Ct. App. 1985). When a federal court is sitting in

18

diversity and applying a state's law, it is required to make its best prediction of how the state supreme court would decide the case. *BMD Contractors, Inc. v. Fid. & Deposit Co. of Maryland*, 679 F.3d 643, 648 (7th Cir. 2012). If the state supreme court has not spoken on a particular issue, then decisions of the intermediate appellate court will control unless there are persuasive indications that the state supreme court would decide the issue differently. *Id.* Here, there are no indications that the Wisconsin Supreme Court would disagree with the decisions of the court of appeals adopting § 772 of the Restatement. Moreover, the Seventh Circuit has determined that the Wisconsin courts have adopted § 772. *Joseph P. Caulfield*, 155 F.3d at 890. Therefore, I will apply that provision.

Horicon contends that a reasonable jury could find that Schumacker and Dairy=Bond's conduct does not fall within the honest-advice privilege because their advice fell outside the scope of Gehl's request for advice, which is embodied in the consulting and licensing agreement. However, the consulting agreement explicitly provided that Schumacker and Dairy=Bond would render advice concerning "the development of specialty dairy ingredient technology." Consulting & Licensing Agreement § 1.2. The development of the alternatives to Horicon's cheese-sauce ingredients unquestionably falls within the scope of this language. Horicon, however, contends that the consulting agreement did not encompass "developing plans to discontinue Gehl's relationship with Horicon," and that Schumacker's actions in drafting the email, dated October 2, 2013, in which he outlines a plan for reducing Gehl's purchases from Horicon to zero, exceeded the scope of the agreement. Br. in Opp. at 29, ECF No. 82. However, phasing out Gehl's purchases of Horicon's products was simply the flipside of phasing in Gehl's use of the specialty dairy ingredients it had hired

19

Schumacker and Dairy=Bond to develop. Thus, in advising Gehl on the transition to the new ingredients, Schumacker and Dairy=Bond did not venture beyond the scope of Gehl's request for advice on the development of specialty dairy-ingredient technology. In any event, Gehl's request for advice was not limited to this topic. The request also included "other advisory services" relating to Gehl's "business," which the contract identified as "developing, manufacturing, selling, and distributing cheese, chili sauces, and nutritional dairy beverages." *See* Consulting & Licensing Agreement § 1.2 and first "whereas" clause. Advising Gehl about the cost savings associated with reducing its purchases of cheese-sauce ingredients from Horicon would have fallen within the scope of this language.

Horicon also contends that, for two reasons, a reasonable jury could find that the advice given by Schumacker and Dairy=Bond was not "honest." First, Horicon contends that the advice was tainted by an undisclosed conflict of interest because Schumacker and Dairy=Bond had their own contract with Avoca under which Avoca paid them a commission for the business they brought to Avoca. Horicon contends that the availability of this commission gave Schumacker an incentive to encourage Gehl to hire Avoca as its contract manufacturer. Assuming, however, that this was a conflict of interest, there is no evidence that it affected the honesty of the advice rendered by Schumacker and Dairy=Bond. Gehl represents that it is satisfied with the advice it received, even though Horicon has brought the supposed conflict of interest to light. *See* Decl. of Timothy Preuninger ¶ 4, ECF No. 91. Gehl also represents that its contract with Avoca, which is now complete, was fair. *Id.* ¶ 9. Moreover, the supposed conflict of interest would only have affected the selection of the contract manufacturer that Gehl hired to produce the substitute products, *i.e.*, the decision to contract with Avoca rather

than some other manufacturer for production of the ingredients Gehl had developed.  It would not have tainted the advice that Schumacker gave Gehl regarding the benefits of Gehl's developing its own ingredients rather than continuing to purchase ingredients developed by third parties such as Horicon.  Thus, no reasonable jury could conclude that Schumacker's potential conflict of interest rendered dishonest the advice he gave to Gehl concerning Horicon's products.

Horicon also contends that a jury could find Schumacker and Dairy=Bond's advice dishonest because Schumacker overestimated the savings Gehl would realize by switching to its own ingredients.  Horicon points out that, in Schumacker's October 2, 2013 email, he projected that if Gehl reduced its consumption of Horicon's Special 23 to zero, it would save approximately $2 million per year.  Horicon contends that this projection was based on the misrepresentation that Gehl could replace Horicon's Special 23 with Gehl's own ingredients and not have to add any other ingredients to its cheese sauces to make up for the loss of Special 23.  In fact, argues Horicon, to fully replace Special 23, Gehl would have had to add cheddar cheese as an ingredient to all of its cheese sauces.  Horicon believes that if the cost of the cheddar cheese had been included in Schumacker's projection, it would not have shown an expected savings to Gehl of $2 million per year.

Horicon does not explain how it has concluded that Schumacker's projection failed to account for the cost of adding cheddar cheese to Gehl's products.  The only evidence it cites to support this conclusion is Robert Studer's declaration, in which he simply asserts that Schumacker's projection was "based on the misrepresentation that the replacement EMC products would fully replace Horicon's EMC products in Gehl cheese sauce products."  Decl. of Robert Studer ¶ 4, ECF No. 83.  However, I have

been unable to find any language in Schumacker's email that appears to be a representation that the replacement products would fully replace Horicon's products and not require the addition of cheddar cheese, and Studer does not explain how he determined that Schumacker made such a representation. Studer seems to draw the conclusion that Schumacker made such a representation from Studer's own belief that the cost of the cheddar cheese would have made it impossible to save $2 million per year. *See id.* ¶ 11. But Studer does not explain how he formed this belief either, and his unsupported speculation regarding Gehl's expected savings does not give rise to a reasonable inference that Schumacker made a dishonest misrepresentation in the October 2 email.[6]

In short, because Schumacker and Dairy=Bond's advice to Gehl concerning the transition to its own ingredients and away from Horicon's products fell within the scope of the honest-advice privilege, Schumacker and Dairy=Bond are entitled to summary judgment on Horicon's claim for tortious interference.

### III. MOTIONS TO SEAL

Before concluding, I address an administrative matter. The plaintiff and defendants Schumacker and Dairy=Bond have filed motions to seal a large volume of materials related to the motions for summary judgment. *See* ECF Nos. 55, 79, 85 & 89. However, the parties have not complied with this district's local rules regarding the sealing of materials that are filed with the court, and therefore their motions to seal will be denied.

---

[6] According to Gehl's chief financial officer, the switch away from Horicon's products did in fact result in savings of at least $2 million per year. *See* Preuninger Decl. ¶ 10.

General Local Rule 79(d) governs confidential matters and sealed records. The rule states that, subject to certain limited exceptions, the court will consider all filed materials public unless they are accompanied by a separate motion to seal. Gen. L.R. 79(d)(1) & (d)(5). The separate motion must be publicly filed and must describe the general nature of the information withheld from the public record. Rule 79(d)(2). "To the extent possible, the movant should include with the public filing a version of the document or material that redacts only those portions of the document that are subject to the sealing request." *Id.* Importantly, the rule contains a meet-and-confer requirement: "Any party seeking to file confidential documents or materials under seal, whether pursuant to a Court-approved protective order or otherwise, must include in the motion a certification that the parties have conferred in a good faith attempt to avoid the motion or to limit the scope of the documents or materials subject to sealing under the motion." Rule 79(d)(4).

The rule also provides that "[a]ny motion to seal must be supported by sufficient facts demonstrating good cause for withholding the document or material from the public record." Rule 79(d)(3). The rule then outlines a procedure that allows the party who originally designated the material as confidential to show good cause, even if that party is not the one that filed the motion to seal. *Id.* In civil litigation, good cause for removing a document from the public record will exist only if the document reveals a trade secret, is covered by a recognized privilege (such as the attorney-client privilege), or contains information required by statute to be maintained in confidence. *Baxter Int'l Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002).

Civil Local Rule 26(e)–(f) applies to confidentiality requests involving discovery materials in a civil case. Rule 26(f) makes clear that a party seeking to file confidential

23

discovery materials with the court must follow General Rule 79(d), even if the material was designated as confidential pursuant to a protective order. The comments to Civil Rule 26 state that "[t]he designation of a paper as confidential under the terms of a protective order is not sufficient to establish the basis for filing that document under seal." Rather, the party seeking to withhold the document from the public record must still demonstrate good cause under General Rule 79(d), *i.e.*, that the material reveals a trade secret or other information that may be withheld from the public record. When the parties in this case filed their stipulated protective order regarding confidential discovery materials, I underscored this requirement by adding language to their proposed order stating that "[n]o document filed with the court will remain sealed unless the party seeking to preserve confidentiality shows good cause." Stipulated Protective Order ¶ 5, ECF No. 26.

The motions to seal filed by Horicon, Schumacker, and Dairy=Bond do not comply with the above rules or with the protective order. The motions simply state that the documents were designated by one of the parties as confidential pursuant to the protective order and should be kept sealed for that reason. The moving party makes no attempt to show that the documents contain trade secrets or other information permitted to be kept confidential in a civil case. The motions do not identify the party that originally designated the documents as confidential, so it is not clear whether the designating party is the movant. To the extent that a non-movant originally designated the documents as confidential, that non-movant has not responded by demonstrating good cause in accordance with General Rule 79(d)(3).

Another problem is that the moving parties have not publicly filed redacted versions of the sealed documents, as required by General Rule 79(d)(2). In this regard,

one of Horicon's motions to seal is particularly egregious. That motion seeks to seal Horicon's entire response to Gehl's motion for summary judgment, including every word of the supporting brief, proposed findings of fact, and supporting declarations and exhibits.

Finally, the parties have not certified that they conferred in a good-faith attempt to avoid filing materials under seal or to limit the scope of the documents subject to sealing, as required by General Rule 79(d)(4).

Because the parties' motions to seal are deficient, they will be denied. However, I will instruct the Clerk of Court to keep the documents associated with those motions under seal for an additional 21 days. A party that wishes to keep any part of the materials sealed for longer than that must, before the expiration of the 21-day period, file a motion that complies with the above rules.

## IV. CONCLUSION

For the reasons stated, **IT IS ORDERED** that Gehl's motion for summary judgment (ECF No. 27) is **GRANTED**.

**IT IS FURTHER ORDERED** that Schumacker and Dairy=Bond's motion for summary judgment (ECF No. 76) is **GRANTED**.

**IT IS FURTHER ORDERED** that Schumacker and Dairy=Bond's motion to dismiss (ECF No. 65) is **DENIED** as **MOOT**.

**FINALLY, IT IS ORDERED** that the parties' motions to seal (ECF Nos. 55, 79, 85 & 89) are **DENIED**. However, the Clerk of Court shall continue to keep the materials associated with those motions sealed. A party that wishes to keep any part of the materials sealed for longer than 21 days from the date of this order must file a motion

that complies with General Local Rule 79(d) and Civil Local Rule 26(e)–(f) before the expiration of the 21-day period.

Dated at Milwaukee, Wisconsin, this 15th day of September, 2016.


s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge